## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     :
                           :
      v.                    :         Criminal No. 2:20-cr-00206-JMG
                           :
DAWAYNE BRIGGS           :
                           :

### MEMORANDUM OPINION

**GALLAGHER, J.**                                                 **March 10, 2021**

## I.  OVERVIEW

In the early morning hours of March 12, 2020, agents with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") executed a search warrant on the apartment of Defendant Dawayne Briggs based on the suspicion that he was engaged in large-scale distribution of illicit narcotics. Mr. Briggs was subsequently taken into custody after a search of his apartment yielded evidence of drug trafficking. ATF agents recovered, among other things, a loaded pistol, drug packaging materials, marijuana, over $30,000 in cash, and other apparent drug proceeds. Mr. Briggs moves to suppress this evidence, arguing that the warrant affidavit contained insufficient probable cause, stale evidence, and material misrepresentations and omissions. Likewise, Mr. Briggs seeks dismissal of all charges against him, alleging that procedural delays incident to the ongoing COVID-19 pandemic violated his constitutional and statutory right to a speedy trial. For the reasons set forth below, Mr. Briggs' Motions are denied.

## II.  FACTUAL BACKGROUND

### a.  Allegations

On March 12, 2020, ATF agents executed a search warrant on 1919 Market Street, Apartment 2702 in Philadelphia, Pennsylvania as part of its ongoing investigation into the Torrence Drug

Trafficking Organization ("DTO").  *See* Compl. ¶ 3, ECF No. 1; Krueger Aff. ¶ 4, Mar. 11, 2020, ECF No. 62.  Witnesses reported that on March 2, 2020, Dawayne Briggs and four other men were seen carrying five large moving boxes containing black trash bags into the third-floor common area of the apartment building.  Krueger Aff. ¶ 4(a)(iii).  As they entered the building, a witness stated that "the entire area was overwhelmed by the odor of marijuana."  *Id.*  The men proceeded to carry the boxes into an elevator and traveled to the 27th floor of the building, where Mr. Briggs' apartment was located.  *Id.*  Investigators subsequently reviewed security camera footage from the apartment complex, which showed the five men, including Mr. Briggs, entering the lobby with moving boxes containing large trash black garbage bags and taking the elevator to the 27th floor.  *Id*.

Since 2017, ATF has been investigating Bradley Torrence and his DTO, which purportedly operates in and around Philadelphia, Delaware, and New Jersey.  *Id.* ¶ 4.  According to investigators, the Torrence DTO distributes illegal narcotics including heroin, cocaine, cocaine base ("crack"), and methamphetamine, the proceeds from which are laundered through various businesses.  *Id.*  Through confidential informants, controlled drug buys, witness interviews, and law enforcement surveillance, investigators obtained extensive evidence detailing the DTO's operations and affiliations.  *Id.*  This investigation culminated in a search warrant application for multiple locations investigators believed were associated with the Torrence DTO's operations, including Mr. Briggs' apartment at 1919 Market Street.  *Id.* ¶ 4(a)(i)-(iv).

Mr. Briggs, who had previously been convicted on a federal drug trafficking charge in October 2009, was on supervised release at the time of the search.  *Id.*  During the preceding investigation, a confidential informant reported that Mr. Briggs "was moving large quantities of heroin in West Philadelphia," was "flooding the Bottom[1]…with cocaine," and that he "previously knew [Mr.] Briggs to distribute large amounts of marijuana."  *Id.* ¶¶ 86, 95.  A different informant also told investigators

---

[1] "The Bottom" refers to a neighborhood in West Philadelphia.  *See* Krueger Aff. ¶ 95.

that Mr. Briggs was presently distributing marijuana in West Philadelphia, along with suspected Torrence DTO member Levon Torrence. *Id.* ¶ 38. Additionally, investigators learned that Bradley Torrence posted a comment on Mr. Briggs' Instagram page in May 2019, and that Mr. Briggs had allegedly attended movie premier hosted by Bradley Torrence in September 2019. *Id.* ¶¶ 95, 144. According to one informant, Torrence DTO co-conspirators and other "large-scale drug dealers" were also in attendance. *Id.* ¶ 144. In January 2020, Levon Torrence purportedly attended a birthday party for Mr. Briggs at a club in Philadelphia, where an informant allegedly observed Mr. Briggs spend approximately $25,000 cash. *Id.* ¶ 38.

In December 2019 and January 2020, investigators viewed social media videos of Mr. Briggs showing off what they believed to be proceeds of his drug trafficking activities. *See id.* ¶ 196. On December 11, 2019, ATF Special Agent Michael Plesniak observed a video posted on Mr. Briggs' Instagram account wherein Mr. Briggs shows the camera a large quantity of $50 and $100 bills. *Id.* Investigators observed another Instagram video on January 14, 2020 showing Mr. Briggs in his apartment putting on a designer watch and necklaces which appear to be laced with diamonds. *Id.* ¶ 4(a)(iii). The video also shows jewelry laid out on a counter in front of Mr. Briggs, along with what appears to be a safe and a stack of money at least four inches tall. *Id.* At one point in the video, Mr. Briggs states that "people think this shit happen overnight," which investigators concluded was a reference to his ascension within the Torrence DTO. *Id.* ¶ 197. During the video, Mr. Briggs is speaking to Nyfis Toppings, who is currently on federal probation resulting from his robbery, firearm, and narcotics-related convictions. *Id.* ¶ 4(a)(iii) n.4. On January 25, 2020, another video on Mr. Briggs' Instagram account shows Mr. Briggs displaying his middle finger to the camera, revealing that he is wearing a diamond ring, to which he refers as a "$13,000 fuck you." Def.'s Mot., Ex. 6 at 0:00:10-00:00:15, ECF No 53.

According to state wage and earning records, Mr. Briggs has remained unemployed since the second quarter of 2018, when he reported wages of $72.00 from Fitness International, LLC.  Krueger Aff. ¶ 196.  Further investigation revealed that Mr. Briggs rented a penthouse apartment at 1919 Market Street in Philadelphia at a monthly rate of $4,540 under the alias of Wayne Bird.  *Id.* ¶ 4(a)(iii).  Additionally, Mr. Briggs leased a black 2019 BMW X7 during this time.  *Id.*  Based on these facts, the activity reported at 1919 Market Street on March 2, 2020, and the information gathered during ATF's investigation into the Torrence DTO, ATF concluded that Mr. Briggs' apartment contained evidence of drug trafficking.  *Id.*

Investigators obtained a search warrant for Mr. Briggs' apartment signed by Magistrate Judge Timothy R. Rice on March 11, 2020, which they executed the following day.  *See* Gov't Resp. Suppress 5.[2]  During the search, agents recovered a loaded Ruger P94 .40 caliber pistol; 1.78 kilograms of marijuana; $31,930 cash, designer jewelry; drug packaging material; mail addressed to Mr. Briggs' alias, Wayne Bird; and false identification in the name of Wayne Bird.  *See* Compl. ¶¶ 3-4; Gov't Resp. Suppress 5, 9. Mr. Briggs was taken into custody on March 12, 2020.  Def.'s Mot. 9.  That same day, investigators filed a complaint alleging that Mr. Briggs had been a felon in possession of a firearm in violation of Title 18 U.S.C. § 922(g)(1).  *See* Compl.

**b.  Procedural History**

On March 12, 2020, Judge Rice signed a complaint and arrest warrant charging Defendant Dawayne Briggs with being a felon in possession of a firearm.  *See* Compl.  That same day, law enforcement personnel took Mr. Briggs into custody and he made his initial appearance before Judge Rice.  Gov't Resp. Dismiss 1.  Mr. Briggs appeared in court again the following day for a preliminary

---

[2] The Government filed two briefs in response to Defendant's Motions, one addressing the Motion to Dismiss and the other addressing the Motion to Suppress.  ECF Nos. 56, 57.  For the purposes of consistency and brevity, the Court refers to the Government's Response to Defendant's Motion to Dismiss as Gov't Resp. Dismiss and the Government's Response to Defendant's Motion to Suppress as Gov't Resp. Suppress.

examination of the Government's complaint. *Id.* During the hearing, ATF Special Agent Kyle Raguz testified and was subject to cross examination by defense counsel concerning the complaint filed against Mr. Briggs. *Id.* The court thereafter found that the Government had established probable cause that Mr. Briggs had been a felon in possession of a firearm on March 12, 2020.[3] *Id.* at 2. The Parties then stipulated to detention based on Mr. Briggs' pending violation of supervised release and he received an initial appearance on that matter as well. *Id.*

On March 18, 2020, in response to state and national emergency declarations following the outbreak of COVID-19, Chief Judge Juan R. Sánchez issued a Standing Order suspending grand jury proceedings and continuing the deadlines for filing an indictment or information.[4] Gov't Resp. Dismiss, Ex. 2. Based on this Standing Order, the Government filed a Motion to Continue on March 24, 2020 seeking an additional thirty days to return an indictment. ECF No. 6. Mr. Briggs filed a Response in Opposition that same day. ECF No. 7. On April 3, 2020, Chief Judge Sánchez granted the Government's Motion. ECF No. 10. Mr. Briggs subsequently filed a Motion for Bail, or in the alternative, a Motion to Reconsider Pre-Trial Detention. ECF No. 11.

On April 7, 2020, Magistrate Judge Richard A. Lloret issued a written order denying Defendant's Motion. ECF No. 14. Pursuant to 18 U.S.C. § 3145, Mr. Briggs filed an Appeal of the Magistrate's Denial on April 8, 2020. ECF No. 15. On April 21, 2020, Defendant appeared before Judge Joshua D. Wolson for a video hearing to review his appeal. ECF No. 20. During the hearing, Mr. Briggs testified to the conditions of his confinement and offered arguments for why bail was appropriate. Gov't Resp. Dismiss 3. On April 22, 2020, Judge Wolson denied Defendant's appeal.

---

[3] During the hearing, the Defense declined the opportunity to argue whether the Government's evidence established probable cause. Gov't Resp. Dismiss 2.
[4] The Governor of Pennsylvania signed an emergency disaster declaration on March 6, 2020 following reports of increasing Novel Coronavirus Disease (COVID-19) cases throughout the state. *See* Proclamation of Disaster Emergency, 50 Pa. B. 1644 (March 21, 2020). On March 13, 2020, the President of the United States declared a national emergency in response to the COVID-19 outbreak across the United States. *See* Proclamation No. 9994, 85 Fed. Reg. 15337 (March 18, 2020).

ECF No. 22.  Mr. Briggs later filed a Motion for Reconsideration, which was denied on May 20, 2020.  ECF Nos. 29, 31.

On April 10, 2020, Chief Judge Sánchez issued a second Standing Order suspending grand jury proceedings and continuing the deadlines for filing an indictment or information until May 31, 2020.  Gov't Resp. Dismiss 4.  Following this second Standing Order, the Government filed a second Motion to Continue on April 24, 2020 seeking an additional thirty days to return an indictment against Defendant.  ECF No. 25.  Mr. Briggs filed a Response in Opposition to the Government's Motion on May 5, 2020.  ECF No. 26.  On May 6, 2020, Chief Judge Sánchez held a telephone conference where the Parties offered their arguments on the Government's Motion.  ECF No. 28.  Chief Judge Sánchez issued a written opinion granting the Government's Motion on May 8, 2020.  ECF No. 27.

Chief Judge Sánchez issued a third Standing Order on May 29, 2020 suspending grand jury proceedings and continuing the deadlines for filing an indictment or information until June 30, 2020.  Gov't. Resp. Dismiss 4.  The Government subsequently filed a third Motion to Continue on June 2, 2020 seeking an additional thirty-day extension of the deadline to return an indictment.  ECF No. 32.  Mr. Briggs filed a Response in Opposition to the Government's Motion that same day.  ECF No. 33.  On June 10, 2020, Chief Judge Sánchez granted the Government's Motion.  ECF No. 35.  On June 30, 2020, Chief Judge Sánchez issued a fourth Standing Order stating that matters subject an indictment deadline would be continued until July 31, 2020, or until the resumption of grand jury proceedings in the district.  Gov't Resp. Dismiss 4.  On July 2, 2020, the Government filed a fourth Motion to Continue seeking an additional thirty days to return an indictment against Defendant, ECF No. 37, and Mr. Briggs filed a Response in Opposition on July 3, 2020.  ECF No. 38.  Chief Judge Sánchez granted the Government's Motion in part, continuing the Government's deadline to return an indictment until July 31, 2020.  ECF No. 40.

On July 14, 2020, a grand jury returned a two-count indictment against Mr. Briggs charging him with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and possession with the intent to distribute for remuneration a mixture and substance containing a detectable amount of marijuana in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D) and 18 U.S.C § 2.  ECF No. 41.  Mr. Briggs was subsequently arraigned before Magistrate Judge Linda K. Caracappa on July 24, 2020. ECF No. 45.  On October 19, 2020, Mr. Briggs filed a Motion to Dismiss alleging that procedural delays resulting from the ongoing COVID-19 pandemic violated his right to a speedy trial.  *See* Def.'s Mot. 27-36.  Mr. Briggs also filed a Motion to Suppress the evidence obtained during the search of his apartment, arguing that the warrant affidavit contained insufficient probable cause, stale evidence, and material misrepresentations and omissions.  *Id.* at 10-24.  The Government filed a Response to Defendant's Motion to Dismiss on November 3, 2020 and a Response to Defendant's Motion to Suppress on November 4, 2020.  ECF Nos. 56, 57.  Mr. Briggs filed a Reply to the Government's Responses on November 5, 2020.  ECF No. 58.  On January 4, 2021, this Court heard oral argument on Defendant's Motions.  ECF No. 63.

### III.    LEGAL STANDARD

#### a.  Motion to Dismiss

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."  U.S. Const. amend. VI. Deprivation of a defendant's Sixth Amendment speedy trial right requires dismissal of the indictment. *Barker v. Wingo*, 407 U.S. 514, 522 (1972).  In determining whether this right has been denied, the court must first decide whether "there is some delay that is presumptively prejudicial."  *United States v. Dent*, 149 F.3d 180, 184 (3d Cir. 1998) (quoting *Barker*, 407 U.S. at 530).  The length of any purported delay is measured from the date of arrest or indictment, whichever is earlier, until the commencement of trial.  *See Hakeem v. Beyer*, 990 F.2d 750, 760 (3d Cir. 1993).  If the court

concludes that the defendant has demonstrated a presumptively prejudicial delay, it must then engage in a "highly fact-specific analysis that balances all the relevant circumstances." *Dent*, 140 F.3d at 184. This requires the court to consider: (1) the length of the delay; (2) the reasons for the delay; (3) whether the defendant has asserted their right to a speedy trial; and (4) the prejudice to the defendant. *Barker*, 407 U.S. at 530-32. During this review, the court must remain mindful that none of these factors are "a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial" and that they "must be considered together with such other circumstances as may be relevant." *Id.* at 533.

In conjunction with a defendant's constitutional right to a speedy trial, the government is also subject to certain statutory obligations concerning the timeframe within which a defendant must be formally charged. Pursuant to the Speedy Trial Act, "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." 18 U.S.C. § 3161(b). Similar to a constitutional violation of a defendant's speedy trial right, failure to file an indictment or information within the statutory limit requires dismissal of the charges. *Id.* § 3162(a)(1). However, in computing the timeframe for when the government must file an indictment or information, certain periods of delay are excludable under the Act. *See id.* § 3161(h). These periods include "[a]ny period of delay resulting from a continuance granted by a judge…if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." *Id.* § 3161(h)(7)(A).

### b. Motion to Suppress

#### i. Sufficiency of Probable Cause

The Fourth Amendment protects "[t]he right of the people to be secure…against unreasonable searches and seizures." U.S. Const. amend. IV. Absent exigent circumstances, investigating officers must obtain a warrant prior to executing a search of an individual's home. *See Payton v. New York*, 445 U.S. 573, 586 (1980). A warrant may issue only upon a determination by a neutral magistrate that, given the totality of the circumstances set forth in the affidavit, probable cause exists to support the proposed search. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983). Probable cause exists where "there is a fair probability that contraband or evidence of a crime will be found" in the location described in the warrant. *Id.* at 238. This a "flexible, common-sense standard" which does not require proof that evidence is more likely than not to be recovered during the search. *See Texas v. Brown*, 460 U.S. 730, 742 (1983). Probable cause is a "fluid concept, turning on the assessment of probabilities in particular factual contexts." *Gates*, 462 U.S. at 232.

When considering a challenge to the validity of a search warrant, "the task of the reviewing court is not to conduct a *de novo* determination of probable cause." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984). Likewise, the court need not definitively conclude that probable cause actually existed. *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001). Instead, the court must decide whether the issuing magistrate had a "substantial basis" for finding probable cause. *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir. 1993). During this review, the court should pay great deference to the magistrate's probable cause determination. *United States v. Harvey*, 2 F.3d 1318, 1321-22 (3d Cir. 1993). The court must also confine itself "to the facts that were before the magistrate judge," and not "information from other portions of the record." *Hodge*, 246 F.3d at 305 (quoting *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993)). In other words, the reviewing court should only assess the facts within the four corners of the probable cause affidavit. *See United States v. Beatty*,

437 F. App'x 185, 187 (3d Cir. 2011).  Additionally, "[t]he supporting affidavit must be read in its entirety and in a commonsense and nontechnical manner."  *Conley*, 4 F.3d at 1206.  If, based on the foregoing, the reviewing court finds that the magistrate had a substantial basis for concluding that the warrant affidavit established probable cause, the court must uphold the warrant as valid.  *United States v. Whitner*, 219 F.3d 289, 296 (3d Cir. 2000).

### ii.  *Franks* Motion

Pursuant to *Franks v. Delaware*, criminal defendants may challenge the veracity of factual representations made in an affidavit upon which a magistrate relied in issuing a warrant.  438 U.S. 154, 172 (1978).  In order to overcome the general presumption of validity attendant to search warrant affidavits and compel an evidentiary hearing, the defendant must make a "substantial preliminary showing" that the affidavit contained false statements of material fact made knowingly or with reckless disregard for the truth.  *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006).  The defendant must predicate their attack on "more than a mere desire to cross examine."  *Franks,* 438 U.S. at 171.  These allegations must be supported by accompanying offers of proof, such as sworn affidavits "or otherwise reliable statements of witnesses."  *Id.*  Mere allegations of negligence or error fall short of a substantial preliminary showing.  *See Franks*, 438 U.S. at 165.  The defendant must challenge the affiant's state of mind, and allege that the affidavit contains intentional falsehoods or statements that the "officer has obvious reasons to doubt," or omissions of fact that "any reasonable person would want to know."  *See Yusuf*, 461 F.3d at 383 (citing *Wilson v. Russo*, 212 F.3d 781, 783 (3d Cir. 2000)).

Even if the defendant makes this requisite showing, no hearing is required if, after the allegedly false material is stricken from the affidavit, there remains a sufficient basis for finding probable cause.  *Franks*, 438 U.S. at 172.  If instead the remaining material is insufficient, the defendant is entitled to a full hearing on the allegations.  *Id.*  The defendant must then "prove, by a

preponderance of the evidence: (1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions were material, or necessary, to the probable cause determination." *Yusuf*, 461 F.3d at 383 (citing *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)). If the defendant meets this burden, "the Fourth Amendment requires that…the fruits of the search [be] excluded to same extent as if probable cause was lacking on the face of the affidavit." *Franks*, 438 U.S. at 155-56.

## IV.   ANALYSIS

### a.  Motion to Dismiss

In seeking dismissal of the charges against him, Mr. Briggs argues that the Government violated his Sixth Amendment rights and the Speedy Trial Act by holding him in custody for 124 days before securing an indictment. Def.'s Mot. 7-8. Mr. Briggs contends that the Standing Orders suspending grand jury proceedings and continuing the deadlines for filing an indictment were unconstitutional as applied to his case and misapplied the factors set forth in *Barker*. *Id.* at 30. According to Mr. Briggs, the "peculiar and unprecedented" circumstances of his case were sufficiently prejudicial to warrant dismissal. *Id.* Likewise, Mr. Briggs maintains that the cause of the delay in bringing an indictment against him was not COVID-19, but the Government's failure to ensure continued operations of the court system during the pandemic. *Id.* at 32.

Mr. Briggs argues that due to the extraordinary circumstances surrounding his case, the length of delay between his arrest and indictment was *per se* prejudicial and that prongs one and four of the Court's *Barker* analysis are functionally one and the same. *Id.* at 30. He further asserts that in holding that the length of his delay was not presumptively prejudicial, the Chief Judge failed to take into account the particular hardships he has faced during his incarceration at the Federal Detention Center in Philadelphia ("FDC Philadelphia"). *Id.* at 30. These hardships include his limited visiting

privileges, restricted access to his attorney, his inability to use the prison law library, his limited access to discovery, confinement to his cell for 23 hours a day, and the prospect of contracting COVID-19 while in custody. *Id.* at 31-32. Mr. Briggs contends that finding no prejudice merely because his detention did not surpass a certain number of days would "gut and render void the constitutional guarantee of a speedy and public trial." *Id.* at 32.

In addition to his argument concerning the prejudice imposed on him during his confinement, Mr. Briggs submits that the delay itself was a result of the Government's deficient response to COVID-19. *Id.* Mr. Briggs claims that despite having advanced knowledge of the pandemic's outbreak, the Department of Justice ("DOJ") took no action to ensure that the court system could continue operations during the quarantine period. *Id.* at 33. According to Mr. Briggs, the Government "turned a blind eye to the impending pandemic" and has attempted to shift the resulting burden onto criminal defendants. *See id.* at 34-36. Accordingly, Mr. Briggs argues that the Government's failure to mitigate the harm to defendants facing prosecution is not a valid reason for continuing the deadline to file an indictment against him on multiple occasions. *Id.* Mr. Briggs also claims that this delay has stalled any disposition of his Violation of Supervised Release ("VOSR"), reasoning that this charge would necessarily be dismissed should he prevail on his Motion to Suppress. *Id.* at 29 n.32.

The Government counters that the continuances granted pursuant to the Standing Orders by Chief Judge Sánchez violated neither Mr. Briggs' Sixth Amendment rights nor the Speedy Trial Act. *See* Gov't Resp. Dismiss 6-7. As a threshold matter, the Government asserts that, according to the applicable case law, the length of delay between Mr. Briggs' arrest and indictment was not presumptively prejudicial. *Id.* at 7-8. Furthermore, the Government contends that an analysis of the *Barker* factors reveals that Mr. Briggs' Motion to Dismiss is without merit. *Id.* at 8. The Government maintains that the unprecedented global pandemic necessitated social distancing protocol that interfered with the Government's ability to present Mr. Briggs' case to a grand jury. *Id.* Similarly,

12

the Government asserts that DOJ was prepared for the pandemic and successfully implemented COVID-19 response measures at the prison where Mr. Briggs had remained in custody. *Id.* at 6. Finally, while acknowledging that federal inmates have endured challenging conditions during the pandemic, the Government also argues that this has not resulted in the kind of prejudice contemplated in *Barker*. *Id.* at 9-10.

In support of the argument that the delay between Mr. Briggs' arrest and indictment was not presumptively prejudicial, the Government asserts that the total period of delay was not 124 days, as suggested by Mr. Briggs. *Id.* at 8. The express terms of the Speedy Trial Act state that the Government must present its case to a grand jury and secure an indictment within thirty days of an individual's arrest. 18 U.S.C. § 3161(b). Thus, according to the Government, the length of delay ran from the initial indictment deadline of April 11, 2020 to July 14, 2020, a period of ninety-four days. Gov't Resp. Dismiss 8. The Government argues that Chief Judge Sánchez correctly applied the applicable case law in holding that this three-month delay was not presumptively prejudicial.[5] *Id.* at 7-8. Furthermore, the Government reiterates that it presented this case to a grand jury on the first day grand jury proceedings resumed in the Eastern District of Pennsylvania. *Id.* at 8.

While conceding that Mr. Briggs asserted his speedy trial right in objecting to each of the motions to continue, the Government contends that the remaining *Barker* factors weigh heavily in its favor. *Id.* at 8-9. According to the Government, the decision by Chief Judge Sánchez to suspend grand jury proceedings and continue the deadline for filing indictments was fully justified, and the reasons for doing so outweighed other competing interests. *See id.* In light of the unprecedented nature of the COVID-19 pandemic, the Government argues that it did not simply fail to present Mr.

---

[5] "In this case, Briggs has been detained without indictment for three months and, pursuant to this continuance, may be detained without indictment for an additional month. A four-month delay, however, is not presumptively prejudicial." *United States v. Briggs*, No. 20-410, 2020 WL 3077171, at *3 (E.D. Pa. June 10, 2020) (citing *United States v. Smith*, No. 04-472, 2004 WL 2612393, at *3 (E.D. Pa. Nov. 16, 2004)).

Briggs' case to a grand jury. *Id.* Instead, the Government was unable to do so based on the social distancing orders issued by state and local officials. *Id.* The Government explains that due to the recommendations of public health authorities cautioning citizens to avoid large social gatherings, the suspension of grand jury proceedings was unavoidable during the initial phase of the pandemic. *Id.* Additionally, the Government points out that Mr. Briggs was not held indefinitely, but was only subject to a brief delay in having his case brought before a grand jury. *Id.* at 9. The Government further notes that Mr. Briggs' incarceration was fully justified by law, having been adjudged a danger to the public following the magistrate's finding of probable cause that Mr. Briggs had been a felon in possession of a firearm. *Id.*

As to the claim that it "turned a blind eye to the impending pandemic," the Government asserts that DOJ took the necessary and appropriate steps to keep federal inmates healthy and alive. *Id.* at 6-7. The Government states that the Bureau of Prisons ("BOP") began contingency planning for a pandemic years before the outbreak of COVID-19 and immediately implemented the appropriate measures upon the declaration of a national emergency. *Id.* at 6. These measures included limiting inmate movement, increasing sanitation measures, suspending most visitations, and utilizing extensive quarantine and testing practices. *Id.* The Government also highlights the fact that while BOP has experienced an unfortunate number of inmate deaths, FDC Philadelphia did not report a single positive case of COVID-19 in its general population until October 2020. *Id.* In addition, the Government emphasizes that accommodations were made to ensure that Mr. Briggs received full due process during his time in federal custody, having been afforded periodic review of his confinement by multiple magistrate and district court judges. *See id.* at 7.

With regards to the fourth *Barker* factor, prejudice to the defendant, the Government notes that Mr. Briggs has failed to identify any evidence that was lost, or any harm to his litigation position, aside from the conditions of his confinement. *Id.* at 12. The Government also stresses that there are

significant justifications for Mr. Briggs' detention, including the fact that he faces VOSR proceedings for his alleged possession of a firearm, the substantial amount of drugs found in his apartment, and his prior use of a false identity. *Id.* at 12 (citing *United States v. Briggs*, No. 20-00410, 2020 WL 1939720, at *1 (E.D. Pa. April 22, 2020)). Finally, the Government asserts that the COVID-19 pandemic has not prevented courts from conducting VOSR proceedings and that Mr. Briggs is incorrect in his assertion that prevailing on the merits of his Motion to Suppress would require dismissal of his VOSR charges.[6]

In applying the factors set forth in *Barker* to the facts of this case, the Court finds that the delay between Mr. Briggs' arrest and indictment did not violate his Sixth Amendment right to a speedy trial. With the exception of Mr. Briggs' assertion of his speedy trial right, each *Barker* factor weighs in the Government's favor. As a threshold matter, the Court finds that the length of delay was not presumptively prejudicial. In *Wells v. Petsock*, the Third Circuit noted that "[t]he length of delay which is presumptively prejudicial, and which triggers plenary inquiry into the circumstances surrounding the delay, will vary with the particular features of each case." 941 F.2d 253, 257 (3d Cir. 1991) (citing *Barker*, 407 U.S. at 531). Relatively brief delays generally do not require the Court to consider the remaining *Barker* factors. *See United States v. Battis*, 589 F.3d 673, 678 (3d Cir. 2009). Delays of sufficient length may, however, necessitate further inquiry into the reasons for the delay and the resulting prejudice to the defendant. *Id.* This is especially so where conditions of the defendant's incarceration fall below normal, established standards. *See Petsock*, 941 F.2d at 257.

---

[6] In support of this contention, the Government cites *Pennsylvania Board of Probation and Parole v. Scott*, where the Supreme Court held that the Exclusionary Rule is inapplicable in state parole revocation hearings. 524 U.S. 357, 362 (1998). In *Scott*, the Court expressly declined to extend the Exclusionary Rule beyond the context of criminal trials. *Id.* at 364. The Government explains that the Fourth and Ninth Circuits have since extended the principle announced in *Scott* to federal supervised release revocation proceedings. *See United States v. Hebert*, 201 F.3d 1103, 1104 (9th Cir. 2000); *United States v. Armstrong*, 187 F.3d 392, 395 (4th Cir. 1999). Similarly, the Government notes that the Third Circuit has declined to apply the Exclusionary Rule in federal probation revocation proceedings. *See United States v. Bazzano*, 712 F.2d 826, 834 (3d Cir. 1983). The Government argues that the Exclusionary Rule likewise does not apply in federal VOSR proceedings. *See* Gov't Resp. Dismiss 10-12.

Nevertheless, longer delays may be tolerated in cases involving more complex or serious crimes. *Battis*, 589 F.3d at 678.

The delay between Mr. Briggs' arrest and indictment was not presumptively prejudicial. Taking into account the thirty-day indictment deadline under the Speedy Trial Act, the actual period of delay in securing an indictment against Mr. Briggs was approximately ninety days. Depending on the nature of the offenses involved, prevailing speedy trial jurisprudence generally counsels that delays of approximately one year are presumptively prejudicial. *Doggett v. U.S.*, 505 U.S. 647, 652 n.1 (1992). Prior holdings addressing this issue in the Third Circuit show that a three-month delay falls well short of this standard. *See, e.g.*, *Hakeem*, 990 F.2d at 760 (explaining that a fourteen-month delay is "not dispositive in and of itself, but is sufficiently lengthy to warrant an inquiry into the other facts"); *Petsock*, 941 F.2d at 257 (holding that although a seven month delay is sufficient to warrant "plenary inquiry into remaining *Barker* factors, the petitioner's pretrial incarceration of 217 days is not compelling" ); *United States v. Smith*, No. 04-472, 2004 WL 2612393, at *3 (E.D. Pa. Nov. 16, 2004) (finding that four-month delay was not presumptively prejudicial). Additionally, Mr. Briggs has been adjudged a threat to the community, a flight risk, and is charged with being a felon in possession of a firearm. *See Briggs*, 2020 WL 1939720, at *1. The serious nature of these allegations adds further weight to the Court's determination that the delay in this case was not presumptively prejudicial.

Even if the Court found that this delay was presumptively prejudicial, an analysis of the remaining *Barker* factors shows that Mr. Briggs was not deprived of his right to a speedy trial. With respect to the second *Barker* factor, the Supreme Court has identified three causes of pretrial delay, including deliberate efforts by the government to delay "in order to hamper the defense," neutral reasons like negligence or overcrowded dockets, and "valid reason[s], such as a missing witness." 407 U.S. at 531. Deliberate attempts to delay "should be weighted heavily against the government."

*Id.* Neutral reasons "should be weighed less heavily" but still receive consideration since "the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Id.*; *Battis*, 589 F.3d at 679-80. Valid reasons, on the other hand, "should serve to justify appropriate delay." *Barker*, 407 U.S. at 531.

Since Mr. Briggs' arrest, the COVID-19 pandemic has drastically, and in some ways permanently, altered every aspect of day-to-day life across the entire planet. To date, more than 28 million cases of COVID-19 have been reported in the United States alone, claiming the lives of over 500,000 individuals.[7] Due to its highly contagious and lethal nature, federal, state, and local health authorities have advised the public to minimize person-to-person contact and avoid large group gatherings.[8] Likewise, federal, state, and local officials have declared states of emergency and ordered intermittent lockdowns and periods of quarantine throughout the course of the pandemic.[9]

The safety precautions necessitated by the COVD-19 pandemic, and subsequent delays in the administration of judicial proceedings, were not part of a deliberate effort by the United States Government to hamper Mr. Briggs' defense. The Chief Judge made the decision to continue indictment deadlines pursuant to guidance from federal and state health authorities, as well as social distancing and stay-at-home orders issued by state and local government officials. Grand juries generally require the participation of twenty-three citizens, with a quorum of sixteen necessary to secure an indictment. *See generally* Fed. R. Crim. P. 6. The high risk of infection, along with the attendant specter of serious adverse health consequences and death, rendered "grand jury proceedings impractical, if not impossible." *See Briggs*, 2020 WL 1939720, at *1. The delay in bringing Mr.

---

[7] *COVID Data Tracker*, Ctrs. for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited Feb. 28, 2021). In Pennsylvania, there have been over 800,000 reported cases of COVID-19, resulting in over 24,000 deaths. *Pennsylvania COVID-19 Dashboard*, Pennsylvania Dep't of Health, https://experience.arcgis.com/experience/ed2def13f9b045eda9f7d22dbc9b500e (last updated Feb. 28, 2021).
[8] *Social Distancing*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last updated Nov. 17, 2020).
[9] *See supra* note 4.

Briggs' indictment was not borne of an attempt to interfere with his defense at trial, it was the result of necessary public safety measures intended to protect the vulnerable, respond to an unprecedented disease ravaging our communities, and save people's lives.

Equally unavailing is Mr. Briggs' assertion that the Government "turned a blind eye" to the pandemic while criminal defendants "sat under the thumb of the court system."  Def.'s Mot. 34, 36. From the time of his arrest until the date of his indictment, Mr. Briggs repeatedly received independent review of the charges against him and of his pretrial detention.  Mr. Briggs made an initial appearance in court on the day of his arrest.  The very next day he appeared for a preliminary hearing, where his counsel had the opportunity to cross-examine one of the investigating agents before Judge Rice found probable cause to believe that Mr. Briggs had been a felon in possession of a firearm.  Approximately three weeks later, Mr. Briggs' pretrial detention was reviewed by Judge Lloret, and again on appeal by Judge Wolson two weeks after that.  Additionally, each continuance of the Government's indictment deadline received individualized review by the Chief Judge of the Eastern District of Pennsylvania.  Mr. Briggs therefore had his case reevaluated at least once during each month between his arrest and indictment.  The Government also obtained an indictment against Mr. Briggs the very first day that grand jury proceedings resumed in this District.  These circumstances do not evidence negligence or indifference on behalf of the Government in bringing charges against Mr. Briggs.[10]

Turning to the final element of the *Barker* analysis, prejudice to the defendant, the Court finds that this factor also weighs in the Government's favor.  Notwithstanding the difficult conditions federal inmates have undoubtedly faced throughout the pandemic, Mr. Briggs has not shown that he

---

[10] Even if Mr. Briggs could sufficiently demonstrate negligence by the Government resulting in pre-indictment delay, this might only tip the scales in his favor if said delay was prolonged, unjustifiable, and directly prejudicial to his defense at trial.  *See Doggett*, 505 U.S. at 657.

has been prejudiced by the delay in this case.  Prejudice from pretrial delay can manifest in two ways: personal prejudice and prejudice to the defense.  *See Hakeem*, 990 F.2d at 760-61.  Personal prejudice includes "oppressive pretrial incarceration" and "the accused's anxiety and concern over the outcome of the litigation or impairment of the defense."  *Id.*  On the other hand, prejudice to the defense includes the loss of favorable witnesses and evidence.  *See Doggett*, 505 U.S. at 657.

Mr. Briggs argues that the hardships he has faced during his incarceration render the delay in this case "*per-se* prejudicial."  *See* Def.'s Mot. 30.  But given that the conditions of his confinement are a product of standardized health protocol aimed at protecting inmates from contracting COVID-19, the Court is unable to conclude that they are "oppressive" within the meaning of *Barker*.  *See United States v. Williams*, No. 18-153, 2021 WL 278306, at *17 (M.D. Pa. Jan. 27, 2021).  These additional limitations and restrictions imposed by BOP were neither arbitrary nor specific to Mr. Briggs alone.  They were necessary precautions taken to save lives.

Mr. Briggs has also made no claim that evidence for his defense has been in any way degraded by the delay in his case.  Although he claims that his ability to meet with his lawyer and use the prison law library has been extremely limited, this is again a consequence of necessary COVID-19 health and safety measures and not due to any delay in securing an indictment against him.  Mr. Briggs likewise claims that this delay has hindered disposition of his VOSR case.  However, as noted in prior proceedings, a decision regarding Mr. Briggs' VOSR charge is not contingent on the outcome of his Motion to Dismiss.[11]  *See, e.g.*, *Briggs*, 2020 WL 3077171, at *4.

On balance, the Court finds that the circumstances of this case do not amount to a violation of Mr. Briggs' Sixth Amendment right to a speedy trial.  Similarly, the Court finds that the delay between Mr. Briggs' arrest and indictment did not violate his rights under the Speedy Trial Act.  In each

---

[11] It is also worth noting that Mr. Briggs did not contest detention on any charges against him during his preliminary hearing on March 13, 2020.  Def.'s Mot. 5.  Furthermore, he did not formally seek release on his VOSR charges until May 29, 2020.  *See* 2:09-cr-00450, ECF No. 16; 2:09-cr-00183, ECF No. 36.

Standing Order, the Chief Judge specifically stated his basis for finding that the ends of justice served by granting a continuance of the Government's indictment deadline outweighed the best interest of the public, and Mr. Briggs, in a speedy trial. *Id.* at *2. The Chief Judge cited the substantial increase in the number of reported COVID-19 cases, public health guidance regarding the precautions necessary to avoid exposure to the virus, and the stay-at-home orders in effect during that period. *Id.* Based on the ongoing exigent circumstances created by the pandemic, the Court concluded that it would be "unreasonable to expect return and filing of [an] indictment within the period specified in 18 U.S.C. § 3161(b)." *Id.* at *3 (citing 18 U.S.C. § 3161(h)(7)(B)(iii)).[12] Mr. Briggs has failed to offer any basis to conclude that the Chief Judge erred in his decision to continue the indictment deadline until grand jury proceedings could safely resume. This decision was necessary and dictated by a once-in-a-lifetime health crisis that brought the entire nation to a virtual halt. Therefore, the Court finds that the period of delay in Mr. Briggs' case was properly excluded from the Government's indictment deadline in accordance with § 3161(h)(7)(A) of the Speedy Trial Act, and thus no violation occurred.

### b. Motion to Suppress

#### i. Sufficiency of Probable Cause

Enshrined within our venerated Bill of Rights is the manifest guarantee that all persons have the right to be free from unreasonable searches and seizures. The primary safeguard by which our

---

[12] Defendant argues that it must be "impossible to conduct trials" before a continuance serves the ends of justice pursuant to 18 U.S.C. § 3161(h)(7)(A). *See* Hearing Transcript at 17, *United States v. Briggs*, No. 20-cr-00206 (E.D. Pa. Jan. 4, 2021), ECF No. 65 ("Hr'g Tr.") (citing *United States v. Olsen*, No. 17-00076, 2020 WL 6145206, at *4 (C.D. Cal. Oct. 14, 2020)). However, the impossibility of conducting a trial is but one of four factors a judge must consider in determining whether to grant a continuance. *See* 18 U.S.C. § 3161(h)(7)(B)(i)-(iv). Indeed, Chief Judge Sánchez specifically predicated his order granting a continuance of the indictment deadline on the third factor, finding that it would be "unreasonable to expect return and filing of [an] indictment within the period specified in 18 U.S.C. § 3161(b)." *See Briggs*, 2020 WL 3077171, at *3 (citing 18 U.S.C. § 3161(h)(7)(B)(iii)). It is also important to note that the holding in *Olsen* concerned pre-trial delay (of approximately three years), not pre-indictment delay (of approximately three months). Accordingly, the Court considers but discerns no persuasive value from this case nor Defendant's contention that continuances are only appropriate when proceeding to trial would otherwise be impossible.

system of justice effectuates this sacred pledge is the requirement that no warrants may issue absent probable cause.  This flexible, common-sense standard allows courts to protect citizens from unreasonable intrusions into their private affairs while affording law enforcement personnel reasonable latitude to enforce our democratically enacted laws.  Before a magistrate sanctions government entry into a private residence, they must conclude that the circumstances in a given case have struck this delicate balance.  In the course of executing their duties, investigating officers must draw reasonable inferences from a variety of sources to decipher whether there exists a fair probability that evidence will be found in the place to be searched.  This task is oftentimes as difficult as it is necessary, and when achieved, merits appropriate deference absent a showing of misconduct.

Mr. Briggs moves to suppress the evidence obtained during the search of his apartment alleging that the warrant and accompanying affidavit were insufficient to establish probable cause. Def.'s Mot. 2.  According to Mr. Briggs, the affidavit relied on unsubstantiated rumors by unknown informants and questionable social media posts.  *Id.* at 3, 12.  Mr. Briggs further claims that the affidavit was misleading due to its lack of specificity and was either intentionally or recklessly vague. *Id.* at 3.  Finally, Mr. Briggs asserts that the information contained in the affidavit was stale as it related to his apartment at 1919 Market Street.  *Id.*  Mr. Briggs argues that due to the nature of the alleged contraband and delay in obtaining the search warrant, the affidavit failed to establish probable cause that contraband would be found in his apartment on the day of the search.  *Id.* at 3-4.

ATF agents submitted a 121-page affidavit in support of its warrant application to search four locations allegedly associated with the Torrence DTO, including Mr. Briggs' apartment.  *See id.* at 11.  Of the 218 paragraphs contained in the affidavit, Mr. Briggs is mentioned in sixteen.  *Id.*  Mr. Briggs asserts that, given the volume of resources expended and evidence collected during the course of ATF's investigation, the affidavit fails to show even an attenuated relationship between himself and the Torrence DTO.  *See id.* at 11-12.  In support of this claim, Mr. Briggs alleges that the

informant statements accusing him of illicit drug activity were "corrupt and polluted" and based on second-hand information from over a year before investigators applied for the search warrant.  *Id.* at 14.  Likewise, Mr. Briggs contends that, in concluding that he was an active drug dealer, investigators failed to confirm unsubstantiated rumors and correct misconceptions regarding Mr. Briggs' lifestyle. *Id.* at 12-14.

Mr. Briggs maintains that investigators did not corroborate the source of the $25,000 he purportedly spent at a night club in January 2020, suggesting that the money could have been collected from others in attendance or that he was later reimbursed.  *Id.* at 12-13.  By refusing to inquire with night club employees regarding the expenditure, Mr. Briggs asserts that the affiant "simply jumped at any gossip and failed to conduct any additional investigation to confirm or dispel any suspicion." *Id.* at 13.  Additionally, Mr. Briggs suggests that references to the videos posted on his Instagram account were a "smoke screen" intended to associate him with the Torrence DTO.  *See id.* at 13-14. Mr. Briggs insists that nothing in the videos indicates when or why they were recorded.  *Id.* at 13.  As with the alleged club expenditure, Mr. Briggs argues that a proper investigation would have revealed alternative explanations for the purportedly suspicious activity.  *Id.*  Mr. Briggs claims that he was a working model and party promoter at the time the videos were filmed.  *Id.* at 13-14.  Having purportedly ignored these facts, Mr. Briggs reasons that ATF's lack of investigation failed to establish that the videos of him flaunting jewelry and money were anything aside from "a young man trying to show off on social media."  *Id.*  Mr. Briggs concludes that the only evidence potentially connecting him to illicit drug activity stems from witness accounts of the March 2, 2020 incident, which he contends was tainted by misrepresentations and omissions by investigators.  *See id.* at 11; *infra* Section IV(b)(ii).

In addition to ATF's supposed failure to uncover alternative explanations for the allegations in the affidavit, Mr. Briggs argues that the information itself was stale and could not support an

inference that drugs would be found in his apartment during the search.  Def.'s Mot. 3-4.  With respect to the witness accounts of the March 2 incident at 1919 Market Street, Mr. Briggs states that the affidavit failed to demonstrate that he regularly used his apartment for illegal activity.  *Id.* at 25.  According to Mr. Briggs, the evanescent nature of the alleged contraband rendered stale any information concerning the marijuana odor at the time the men entered the building with the boxes.  *See id.* at 25-26.  Given that marijuana is a commodity sold at a fast rate, Mr. Briggs argues that there was no justification for concluding that marijuana would be found in his apartment ten days later.  *Id.*  Mr. Briggs also highlights the fact that the affidavit failed to include video footage showing the boxes being removed from the building less than one hour after witnesses saw them being carried into the common area.  *Id.* at 25.  Mr. Briggs surmises that due to the stale nature of this information, the magistrate lacked a substantial basis for finding probable cause to believe that marijuana would still be in the apartment at the time of the search.  *Id.* at 26.

In response to these arguments, the Government asserts that the warrant was in fact supported by probable cause and that the magistrate had a substantial basis for reaching this conclusion based on the affidavit.  Gov't Resp. Suppress 5.  The Government argues that the information collected from confidential informants, social media posts, and the March 2, 2020 incident constituted sufficient probable cause to justify a search of Mr. Briggs' apartment.  *Id.* at 8-9.  Likewise, the Government maintains that evidence was not stale at the time of the search due to the reasonable inference that drug dealers retain contraband in their homes.  *Id.* at 15-16.  These arguments notwithstanding, the Government contends that were the Court to find that the magistrate lacked a substantial basis for his probable cause determination, any reasonable agent would still have believed that the warrant, on its face, presented sufficient probable cause for a search.  *Id.* at 10.

Prior to their application for a search warrant, investigators state that they received information that Mr. Briggs, who was then on federal supervised release for a prior narcotics

conviction, was again dealing drugs.  *Id.* at 8.  On April 1, 2019, a confidential informant told investigators that Mr. Briggs was "moving large quantities of heroin" in West Philadelphia.  Krueger Aff. ¶ 86.  The informant also told investigators that Mr. Briggs was "flooding the Bottom…with cocaine," that he had previously distributed large amounts of marijuana, and that he believed that Mr. Briggs received his drug supply from Bradley Torrence.  *Id.* ¶¶ 86, 95.  A second informant stated that Mr. Briggs was actively distributing marijuana in West Philadelphia, along with suspected Torrence DTO member Levon Torrence.  *Id.* ¶ 38.  Around May 30, 2019, an informant told investigators that Mr. Briggs had stated on Instagram that he was making money selling drugs and that Bradley Torrence had commented on Mr. Briggs' Instagram page.  *Id.* ¶ 95.  Additionally, investigators learned that Mr. Briggs, along with other "large-scale drug distributors," attended at a movie premier hosted by Bradley Torrence on September 6, 2019.  *Id.* ¶ 144.  Following these reports, investigators concluded that Mr. Briggs was associated with the Torrence DTO and sought additional evidence regarding his potential drug-related activities.  *See* Gov't Resp. Suppress 8.

Further investigation revealed that despite not reporting any gainful employment to the Commonwealth of Pennsylvania since 2018, Mr. Briggs was leasing a black 2019 BMW X7 and living in a $4,540 per month penthouse apartment under the alias of Wayne Bird.  Krueger Aff. ¶ 4(a)(iii).  Investigators then viewed a series of social media videos showing Mr. Briggs handling large amounts of cash and expensive jewelry.  Gov't Resp. Suppress 9.  On December 11, 2019, ATF Special Agent Michael Plesniak observed a video posted on Mr. Briggs' Instagram account wherein Mr. Briggs shows the camera what appears to be a large amount of $50 and $100 bills.  *Id.* ¶ 196.

During the video, Mr. Briggs refers to himself as "blue cheese wheeze" and states that "this shit normally blue but this shit pink today…my off-day is pink." [13]  Def.'s Mot., Ex. 7 at 0:00:04-0:00:42.

On January 14, 2020, investigators observed another video on Mr. Briggs' Instagram page showing Mr. Briggs standing in his apartment dawning a designer watch and necklaces that appear to be laced with diamonds.  Krueger Aff. ¶ 4(a)(iii).  The video also shows jewelry on the counter in front of Mr. Briggs, along with what appears to be a safe and a stack of money at least four inches in height.  *Id.* ¶¶ 4(a)(iii), 197.  At one point, Mr. Briggs states that "people think this shit happen overnight…they don't know I just did eight…they don't even know…stood tall."  Def.'s Mot., Ex. 5 at 0:00:03-00:00:28.  Investigators understood these statements to be a reference to his ascension within the Torrence DTO.  Krueger Aff. ¶ 197.  On January 25, 2020, investigators observed a third video posted on Mr. Briggs' Instagram account, wherein Mr. Briggs is wearing what appear to be diamond-laced necklaces.  Def.'s Mot., Ex. 6.  He then shows the camera his middle finger, revealing a diamond ring to which he seems to refer as a "$13,000 fuck you."  *Id.* at 0:00:10-00:00:15; Krueger Aff. ¶ 197.  During this same period, an informant attended a birthday party for Mr. Briggs at 1209 Vine Street in Philadelphia, PA.  Krueger Aff. ¶ 38.  According to the informant, Levon Torrence was in attendance and Mr. Briggs spent approximately $25,000 cash on his guests during the party.  *Id.*

On March 2, 2020, investigators received a report that Mr. Briggs and four other men were seen carrying several moving boxes into the third-floor common area at 1919 Market Street.  *Id.* ¶ 4(a)(iii).  Upon their entry into the building, one witness stated that "the entire area was overwhelmed by the odor of marijuana."  *Id.*  The men then proceeded into an elevator and took the boxes to the

---

[13] Given the currency denominations Mr. Briggs is holding in the video, "blue" and "pink" appear to be a reference to $100 and $50 bills.  Modern $100 bills feature a blue 3-D security ribbon woven into the paper across the right side of the bill.  Additionally, $100 bills have a blue tint while $50 bills have pink hue.  *See* United States Secret Service, *Know Your Money* (2016), https://www.secretservice.gov/sites/default/files/reports/2020-12/KnowYourMoney.pdf.

27th floor, the location of Mr. Brigg's penthouse. Gov't Resp. Suppress 4. Investigators subsequently reviewed security camera footage from the apartment complex, which shows the five men, including Mr. Briggs, entering the third-floor lobby with large U-Haul moving boxes containing black garbage bags and taking the elevator to the 27th floor. Krueger Aff. ¶ 4(a)(iii).

Based on this information, investigators obtained a search warrant for Mr. Briggs' apartment on March 11, 2020. Gov't Resp. Supp. 5. The Government emphasizes that the warrant sought authorization to search for evidence of drug trafficking, not just the contents of the boxes from the incident on March 2. *Id.* at 9. According to the Government, it was reasonable for the magistrate to conclude that, because Mr. Briggs was likely dealing drugs again, evidence of that crime was likely to be recovered during the search. *Id.* The Government maintains that the magistrate had a substantial basis for his probable cause finding given the evidence in the affidavit. *See id.* Therefore, the Government argues that the warrant should be upheld by the Court. *Id.*

The Government also contends that the information in the warrant affidavit was not stale at the time of the search. *Id.* at 15. In support of their argument, the Government asserts that it is reasonable to infer that a drug dealer would store evidence of illicit drug activity in his home for both safety and accessibility. *Id.* at 15-17. The Government reasons that the magistrate had a substantial basis for finding probable cause to believe that drug paraphernalia would still be in the apartment nine days after the events of March 2. *Id.* at 17. Additionally, the Government argues that even if the Court found that the magistrate lacked a substantial basis for his probable cause finding, the good faith exception applies in this case and Mr. Briggs' Motion should still be denied. *Id.* at 10.

Upon consideration of the evidence presented within the four corners of the warrant affidavit, the Court finds that the magistrate had a substantial basis for his probable cause determination. Probable cause simply requires a "fair probability that contraband or evidence of a crime will be found in a particular place." *Conley*, 4 F.3d at 1205. "Direct evidence linking a residence to criminal

activity is not required to establish probable cause." *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002). Oftentimes, probable cause can be "inferred by considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment, and normal inferences about where a criminal might hide the fruits of his crime." *Hodge*, 246 F.3d at 305. For crimes involving large-scale narcotics trafficking, investigators and the reviewing magistrate may reasonably infer that evidence is likely to be found where a suspected dealer resides. *See Burton*, 288 F.3d at 103-04; *Hodge*, 246 F.3d at 306. A suspect in this instance could "logically conclude that his residence is the best, and probably the only, location to store items such as records of illicit activity, phone books, address books, large amounts of cash, assets purchased with proceeds of drug transactions, guns to protect drugs and cash, and large quantities of drugs to be sold." *Whitner*, 219 F.3d at 298.

The search warrant application sought authorization to search Mr. Brigg's apartment for evidence of drug trafficking. *See generally* Krueger Aff., Attach. B. ATF's preceding investigation employed the use of pen register trap and trace ("PRTT") orders; call detail records ("CDR"); GPS location information search warrants; fixed remote surveillance; aerial and remote video surveillance; review of security camera footage; confidential informants; seizure of abandoned property; analysis of arrest records, financial records, business documents, travel records, and tax records; controlled purchases; review of social media postings; grand jury subpoenas; court orders; and prior search warrants. *See generally* Krueger Aff. As a result, investigators learned that Mr. Briggs was purportedly selling large quantities of drugs in West Philadelphia. Informants had also reported that Mr. Briggs was associating with other suspected members of the Torrence DTO. Investigators sought to corroborate these reports by viewing his Instagram page, which repeatedly showed Mr. Briggs handling large amounts of money and what appeared to be expensive jewelry. The videos also showed Mr. Briggs interacting with other convicted drug dealers and suspected members of the Torrence DTO. A review of Mr. Briggs' financial records showed that despite reporting no income

to the state for nearly two years, he leased a luxury penthouse apartment under an assumed name,[14] leased a luxury vehicle, and purportedly spent large quantities of money at clubs in Philadelphia.

Around this time, civilian witnesses with no connection to ATF's investigation reported that Mr. Briggs and four other men entered the common area at 1919 Market Street on March 2, 2020 carrying large U-Haul boxes filled with black trash bags. One of the other men was convicted drug dealer Nyfis Topping. Krueger Aff. ¶ 4(a)(iii). According to witnesses, a strong marijuana odor was present at the time the men entered the building with the boxes. The men then proceeded to take the elevator to the 27th floor, the same floor as Mr. Briggs' penthouse apartment. Investigators reviewed surveillance footage from the apartment building in order to corroborate these reports, and the footage showed the events unfolding as described by the witnesses. Based on this information, along with the evidence collected about other suspected members of the Torrence DTO, investigators submitted a 121-page affidavit seeking authorization to search, among other locations, Mr. Briggs' apartment.

The totality of information available at the time of the search gave rise to a fair probability that investigators would find evidence of drug trafficking in Mr. Briggs' apartment. Applying their training and experience to the facts at hand, investigators reasonably inferred that Mr. Briggs was a drug dealer and that he was storing evidence of his illicit activities in his apartment. These deductions were within the normal incidents of criminal investigation. Given the nature of the crime, the opportunity for concealment, and the reasonable inferences concerning where Mr. Briggs may store such evidence, the magistrate had a substantial basis for finding probable cause to believe that evidence of drug trafficking would be found at 1919 Market Street, Apartment 2702.

The Court is unpersuaded by Mr. Briggs' contention that the age of the information in the affidavit vitiated any probable cause for the search. Stale information "may have little value in

---

[14] Agent Krueger attested that leasing an apartment using a false identity "is typical of drug dealers, especially those on Federal probation attempting to avoid law enforcement detection of where they store their contraband." Krueger Aff. ¶ 4(a)(iii).

showing that contraband or evidence is likely to be found in the place for which the warrant is sought." *United States v. Williams*, 124 F.3d 411, 420 (3d Cir. 1997). However, the age of the evidence supporting a search warrant is but one factor in the probable cause calculus. *Harvey*, 2 F.3d at 1322. Likewise, a mere lapse of time is not dispositive in assessing staleness claims. *United States v. Zimmerman*, 277 F.3d 426, 434 (3d Cir. 2002). The likelihood that the evidence sought will be found at the place to be searched depends on several factors including the nature of the crime, the suspect, the items to be seized, and the locus of the search. *United States v. Tehfe*, 722 F.2d 1114, 1119 (3d Cir. 1983). Within the context of an ongoing narcotics investigation, periods of weeks or even months between an act giving rise to probable cause and the warrant application do not necessarily render the information stale. *United States v. Gallo*, 110 Fed. App'x 265, 267-68 (3d Cir. 2004) (holding that evidence of drug dealing was not stale due to twenty-day interval between controlled buy and search of suspect's home).

The Third Circuit has consistently reaffirmed the "reasonable inference…that drug dealers often store evidence of drug crimes in their residences." *United States v. Stearn*, 597 F.3d 540, 559 (3d Cir. 2010) (citing *Burton*, 288 F.3d at 104). Courts generally adopt this conclusion "based on evidence supporting three preliminary premises: (1) that the person suspected of drug dealing is actually a drug dealer; (2) that the place to be searched is possessed by, or the domicile of, the dealer; and (3) that the home contains contraband linking it to the dealer's activities." *Burton*, 288 F.3d at 104. In other words, "a magistrate may infer probable cause to search [a] drug dealer's home so long as the affidavit establishes a nexus between the dealer's home and the crime under investigation." *Stearn*, 597 F.3d at 560. In the instant case, investigators and the magistrate concluded that evidence of drug trafficking was likely to be found in Mr. Briggs' apartment at the time of the search. They based this inference on corroborated reports which implicated Mr. Briggs as a drug dealer, his association with the Torrence DTO, and video evidence that appeared to show Mr. Briggs transporting

drugs to, and possessing drug proceeds within, his apartment. This evidence established a nexus between his home and the crime under investigation, and the lapse of nine days between the March 2 incident and the search of the apartment did not erode this connection.[15]

### ii. *Franks* Motion

In addition to lacking probable cause, Mr. Briggs also contends that the warrant was tainted by material misrepresentations and omissions of material fact. Def.'s Mot. 3. He asserts that agents mischaracterized the events of March 2 by failing to include video surveillance that would have corrected misleading statements and omissions in the affidavit. *Id.* Mr. Briggs also claims that the affidavit failed to include direct quotes from the videos posted on his Instagram page and instead included the agent's own interpretation of his statements made in these videos. *Id.* According to Mr. Briggs, the Court must excise these statements from the affidavit, leaving no constitutional basis to support the warrant to search his apartment. *Id.* at 23-24.

Mr. Briggs asserts that "Special Agent Krueger materially misrepresented and omitted necessary facts regarding the alleged incident at [his] apartment building on March 2, 2020." *Id.* at 15. In their application for the search warrant, Mr. Briggs claims that investigators intentionally failed

---

[15] Even if the magistrate lacked a substantial basis for finding probable cause to support a search, Mr. Briggs has offered no compelling evidence disputing that investigators executed the search warrant in good faith. Even where a warrant is later found to lack probable cause, evidence seized during a search is admissible when investigating officers act with objective good faith and within the scope of the warrant. *United States v. Leon*, 468 U.S. 897, 902-24 (1984). Issuance of a warrant from a neutral and detached magistrate is generally a sufficient basis for establishing good faith. *Hodge*, 246 F.3d at 307-08. However, an officer's reliance on a search warrant is unreasonable in cases involving (1) deliberately or recklessly false affidavits; (2) a magistrate's failure to perform their duties in a neutral and detached manner; (3) warrants "so lacking in indicia of probable cause" as to render the officer's reliance unreasonable; and (4) facially deficient warrants which fail to particularize the place to be searched or things to be seized. *Id.* at 308. Ultimately, the primary consideration is "whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate judge's authorization." *Id.* at 307. Agents in the instant case obtained a facially valid search warrant which described the places to be searched and items to be seized. The warrant was supported by an affidavit that articulated in specific detail the facts giving rise to probable cause for the search. Mr. Briggs has presented no evidence to suggest that the magistrate acted in anything other than a neutral and detached manner. Finally, as discussed in more detail in Section IV(b)(ii) *supra*, the magistrate's finding of probable cause was also not predicated on deliberately or recklessly false representations or omissions. Investigators relied in good faith on the validity of the search warrant, and the evidence seized during the search is therefore admissible.

to include actual security footage or images of the event in order to mislead the magistrate. *Id.* at 23. Instead, he argues that the affidavit falsely states that witnesses reported that the boxes carried by Mr. Briggs and his associates smelled like marijuana. *Id.* at 19. Mr. Briggs claims that there is "a huge and obvious difference" between the statements in the affidavit and those contained in a report by the apartment manager from the day of the incident. *See id.* According to the affidavit, "Witness 3 explained that as the crew entered the lobby, the entire area was overwhelmed by the odor of marijuana." Krueger Aff. ¶ 4(a)(iii). An inter-office memorandum from apartment manager Terri Burkett states in relevant part that "[i]t was reported that there were several men carrying U-haul boxes with black trash bags in them and that there was a strong odor of marijuana." Def.'s Mot., Ex. 1. Mr. Briggs maintains that, as evidenced by Ms. Burkett's memorandum, the affidavit's declarations concerning the source of the marijuana odor were "not truthful, intentionally misleading and therefore a material misrepresentation." *Id.* at 19-20.

Mr. Briggs also claims that video footage from the common area demonstrates that the affidavit's sole reliance on video footage from inside the elevator was part of an intentional effort to mislead or, alternatively, evidence of a willful blindness to the truth. *Id.* Specifically, Mr. Briggs takes issue with the fact that the Government only disclosed the video footage from inside of the elevator used by Mr. Briggs and his associates to transport the boxes to the 27th floor.[16] *Id.* at 18 n.18. He argues that footage from a second camera in the third-floor common area does not support the affidavit's version of events. *Id.* Mr. Briggs contends that nothing in the hallway footage would enable investigators to distinguish whether the marijuana odor came from the boxes or some other

---

[16] This video footage shows Mr. Briggs and four other men boarding an elevator with five large U-Haul boxes containing black trash bags on March 2, 2020. *See* Def.'s Mot., Ex. 4.

source.[17]  *Id.* at 20.  In fact, he claims that the footage proves that no one else was present in the common area that could attest to the presence of a marijuana odor at the time Mr. Briggs and his associates entered with the boxes.  *Id.*  Mr. Briggs also insists that nothing in the video shows that the men actually took the boxes into his apartment and that the video actually shows his associates carrying boxes out of the building "immediately" after the event in question.  *Id.* at 21.

Aside from the video footage from the March 2 incident, Mr. Briggs also argues that the affidavit intentionally offered false explanations for his statements in the videos on his Instagram page.  *Id.* at 22.  In describing the video where Mr. Briggs dawns designer jewelry in his apartment, the affidavit states that when Mr. Briggs proclaims that "people think this shit happen overnight," he was referring to his drug dealer lifestyle and ascension within the Torrence DTO.  Krueger Aff. ¶¶ 4(a)(iii), 197.  Mr. Briggs asserts that the affiant presented this interpretation as fact because he failed to preface it with "in my opinion" or "I believe."  *See* Def.'s Reply 4, ECF No. 58.  He also claims that the video included no reference to the drug trade or the Torrence DTO.  *Id.*  As a cumulative result of each of these purported embellishments and omissions, Mr. Briggs suggests that the affiant misled the magistrate into finding probable cause for issuance of a warrant.  Def.'s Mot. 23.  Accordingly, he argues that the evidence obtained during the search must be excluded.  *See id.* at 24.

The Government responds that the warrant affidavit accurately states the facts known to investigators at the time of the search.  Gov't Resp. Suppress 12.  Applying the *Franks* standard to the facts of this case, the Government asserts that Mr. Briggs cannot establish the existence of intentional or reckless misrepresentations or omissions of material fact.  *Id.* at 11-13.  The Government argues that Mr. Briggs has merely alleged that there were errors in the affidavit, which

---

[17] Mr. Briggs has offered a variety of alternative theories regarding the potential sources of the marijuana smell, including other individuals passing through the common area, tenants smoking marijuana in their rooms, open elevators, and smells from the adjacent parking garage.  Def.'s Mot. 20-22.  Furthermore, he asserts that the Government's failure to investigate prior complaints by residents concerning marijuana odors on other floors in the building is "mind blowing" and "patent evidence that [investigators] were either willfully blind or less than candid with the court."  *Id.* at 22.

is insufficient to establish a *Franks* violations.  *Id.* at 11-12.  Given this purported inability to make the requisite substantial preliminary showing, the Government contends that the warrant is valid and that Mr. Briggs' Motion to Suppress should be denied.  *Id.* at 11-14.

According to the Government, the video of from inside of the elevator at 1919 Market Street was the only video agents had in their possession at the time they drafted the affidavit.  *Id.* at 12.  Regardless, the Government argues that video footage from the third-floor common area supports the affidavit's description of events.  *Id.*  The common area footage shows five men, including Mr. Briggs, enter the building carrying five U-Haul moving boxes and taking them to the 27th floor.  *Id.*  While the Government concedes that the video later shows two men bring boxes back down to the parking garage, they note that the men are only carrying three boxes and that they were now sealed at the top.  *Id.*

The Government also maintains that the inter-office memorandum is consistent with statements in the affidavit concerning the marijuana odor reported by witnesses.  *Id.*  Additionally, the Government reasons that even if agents were aware of previous complaints by residents regarding marijuana smoke in the building, it would have no bearing on whether there was probable cause to search Mr. Briggs' apartment.  *Id.* at 12-13.  The Government states that the evidence obtained by investigators suggested the transportation of bulk marijuana, the smell of which is distinct from burning marijuana.  *Id.* at 13.  Without evidence to suggest that anyone was smoking marijuana at the time, and with evidence indicating the presence of bulk marijuana in the common area, the Government reasons that the affiant's inference that the boxes contained fresh marijuana was justified.  *Id.*

Ultimately, the Government emphasizes that a *Franks* inquiry does not require a balancing of every known and unknown fact at the time of the affidavit.  *Id.*  Likewise, it does not require the Government to factually prove the defendant's guilt.  *Id.*  The reviewing court must instead determine

whether false statements or omissions were made knowingly and intentionally, or with reckless disregard for the truth, regarding facts that were material to the finding of probable cause. *Id.* The government argues that the mere possibility of an innocent explanation does not render a statement false or make the events described in the affidavit any less relevant to the magistrate's finding of probable cause. *Id.*

In light of the evidence offered by the Parties in their briefs and at the evidentiary hearing, the Court finds that Mr. Briggs has not made a substantial preliminary showing that the affidavit contained false statements or omissions of material fact made knowingly or with reckless disregard for the truth. At no point in his argument has Mr. Briggs shown that the affiant made any statements which he had obvious reason to doubt or omitted information that a reasonable person would want to know. As an initial matter, the fact that agents did not include the hallway surveillance footage with the affidavit, or inquire about previous complaints in the apartment building about marijuana smoke, does not amount to intentional or reckless omissions of material fact. The *Franks* standard does not require affiants to recite the entire history of events, convey every possible detail, or entertain every conceivable alternative explanation before applying for a search warrant.[18] *See Russo*, 212 F.3d at 787 ("Merely because a fact would be of interest to a defense lawyer at trial does not render its omission subject to *Franks*."). The reality is that "in many cases…it is desirable for officers to provide the magistrate with a distilled version of the circumstances giving rise to probable cause." *Dempsey v. Bucknell University*, 834 F.3d 457, 471 n.10 (3d Cir. 2016). Even if investigators had submitted the common-area security video along with the affidavit, it would have only further corroborated their account.

---

[18] Furthermore, the affidavit puts the magistrate on notice that it does not include "every fact known to [Agent Krueger] concerning this investigation" but only those "necessary to establish probable cause to search the properties." Krueger Aff. ¶ 3.

Mr. Briggs argues that the surveillance footage from the third-floor common area demonstrates that the affiant misrepresented the events of March 2, 2020.  However, the evidence does not support this contention.  The affidavit states in relevant part:

> On or about March 2, 2020, S.A. K. Raguz interviewed Witness 3, whom [sic] was alerted to BRIGGS and his drug associates entering 1919 Market Apartments sliding/moving boxes through the lobby to the elevator. Witness 3 explained that as the crew entered the lobby, the entire area was overwhelmed by the odor of marijuana. Another person, Witness 4, observed the five men around the elevator and witnessed the same odor. Witness 4 reported their encounter to Witness 3. Investigators received images and video from the apartment complex's security video [sic]. In summary, the five men, which includes BRIGGS, TOPPING and other known and unknown drug associates, are moving/sliding boxes that are about the size of a standard moving box. The contents of the boxes is [sic] within large trashcan sized black garbage bags. The video footage captures the crew transport their suspected bulk amounts of marijuana to the 27th floor, which is where BRIGGS Penthouse apartment is located.

> Krueger Aff. ¶ 4(a)(iii).

In the video from the third-floor common area, Mr. Briggs and four other men come into the building from the parking garage at 4:51 p.m.  Def.'s Mot., Ex. 3 at 4:51:29.  The men are carrying or dragging a total of five large U-Haul boxes, open at the top, containing large black trash bags. *Id.*  In the three minutes immediately preceding their entry, two individuals can be seen entering and exiting the common area.  *Id.* at 4:48:56-4:49:12.  Approximately eighteen seconds after the men walk through the doors to the common area, the elevator doors on the left side of the screen open, and one of the men makes a gesture to the individual in the elevator apparently indicating that they will take the next available elevator.  *Id.* at 4:51:47.  Less than one minute later, elevator doors on the left side of the screen open again and the men again indicate to the person inside that they will wait for another elevator.  *Id.* at 4:52:25; Def.'s Reply., Ex. 9.  About thirty seconds later, elevator doors on the right side of the screen open, and the men once again indicate to the person inside that they will wait for another elevator.  Def.'s Mot. Ex. 3 at 4:52:50.  At the same time, a man walking his dog enters the common area from the garage and walks past the men on his way to the third-floor apartments.  *Id.* at 4:52:54.

The men eventually carry the boxes into an empty elevator on the far left side of the screen at 4:53 p.m.  *Id.* at 4:53:20-4:53:29.  Approximately one minute later, a woman exits an elevator on the right side of the screen, walks to the doors to the garage to let a man inside, and then returns to the elevator on the right side of the screen.  *Id.* at 4:54:36-4:54:50.  Less than three minutes after that, an individual who Defense Counsel identifies as apartment manager Terri Burkett exits an elevator on the right side of the screen.  *Id.* at 4:57:29; Hearing Transcript at 82, *United States v. Briggs*, No. 20-cr-00206 (E.D. Pa. Jan. 4, 2021), ECF No. 65 ("Hr'g Tr.").  Ms. Burkett walks around the common area and appears to sniff the air near the elevator where the five men entered with the boxes.  Def.'s Mot., Ex. 3 at 4:57:29-4:58:21.  Approximately thirty minutes later, two of the men who entered the building with Mr. Briggs exit an elevator on the left side of the screen.  *Id.* at 5:33:39-5:33:48.  The men are now using a dolly to transport three U-Haul boxes, closed at the top, out through the doors back into the parking garage.  *Id.*

Upon review of the video, to borrow a football term, the affidavit's description of events not only stands as called, but is confirmed.  Nothing in the security footage contradicts or otherwise refutes Special Agent Krueger's statements in the affidavit.  The core of Mr. Briggs' objection appears to center on the fact that no witnesses were standing in the hallway *at the exact moment* the five men crossed the threshold of the door leading into common area.  *See* Hr'g Tr. at 73, 76-79, 88-93; Def.'s Reply 3.  Mr. Briggs offers this as definitive proof that the affiant intentionally misrepresented a material fact when stating "Witness 3 explained that *as the crew entered the lobby*, the entire area was overwhelmed by the odor of marijuana."  Krueger Aff. ¶ 4(a)(iii) (emphasis added).  Despite his belief that this splinters the Government's case, Mr. Briggs is merely splitting hairs.  The video clearly shows numerous people in the third-floor common area before, during, and

after Mr. Briggs and his associates enter the building.[19]  Any reasonable observer could fairly describe the sequence of events beginning with the five men walking through the doors, bringing the boxes inside, pushing the elevator button, waiting in the common area, and boarding the elevator as their "entry" into the building.  Likewise, any one of the individuals clearly present at that time could have observed the marijuana odor.

　　　Mr. Briggs' contention that the inter-office memorandum conflicts with the affidavit likewise calls for a level of hyper-technical precision that is not required under our Fourth Amendment jurisprudence or *Franks*.  The memorandum states that Ms. Burkett was alerted to "suspicious activity in the third floor elevator lobby" and that "[i]t was reported that there were several men carrying U-Haul boxes with black trash bags in them and that there was a strong odor of marijuana."  Def.'s Mot., Ex. 1.  Ms. Burkett then explains that, after viewing the camera footage, she proceeded to the area and found "the third floor elevator lobby to have a strong odor of marijuana."  *Id.*  Notwithstanding the possibility that the witness may have simply conveyed their account differently to Ms. Burkett than to S.A. K. Raguz,[20] the only distinction between the statements in the memorandum and those in the affidavit is the phrase "as the crew entered the

---

[19] The Defense went to great lengths during oral argument to note in specific detail the number of individuals entering and exiting the third-floor common area during this time.  Hr'g Tr. at 77-83.  Defendant's brief likewise concedes that "twenty-four (24) people pass in and around the hallway during the 70 minutes of review."  Def.'s Mot. 20.

[20] Much of Mr. Briggs' argument takes issue with the accuracy of the statements provided by independent civilian witnesses, as well as their ability to detect the smell of marijuana.  *See* Def.'s Mot. 20-22; Def.'s Reply 3.  These arguments are without force, however, since the relevant inquiry here is the veracity of the *affiant's* statements.  *See Franks*, 438 U.S. at 471; *United States v. Brown*, 3 F.3d 673, 677 (3d Cir. 1993).

lobby."[21]  Mr. Briggs has failed to demonstrate how this difference is material, let alone an intentional or reckless misrepresentation of fact.[22]

Likewise, Special Agent Krueger's characterizations of Mr. Briggs' Instagram videos do not constitute grounds for a *Franks* inquiry.  Mr. Briggs suggests that the inferences in the affidavit were part of an effort to intentionally mislead the magistrate in this case.  However, it is firmly within the reviewing magistrate's prerogative to afford substantial deference to the conclusions of experienced law enforcement officers when evaluating a search warrant application.[23]  *See Whitner*, 219 F.3d at 296.  At the beginning of the affidavit, Special Agent Krueger states that the information within is "based upon [his] personal observations and investigation, information relayed to [him] by other special agents and/or other law enforcement agents, as well as official reports of law enforcement."  Krueger Aff. ¶ 3.  Later in the affidavit, after describing the events of March 2, 2020 and Mr. Briggs' Instagram videos, Special Agent Krueger states that "based on the forgoing, *I believe* [Mr. Briggs] maintains contraband at his apartment, to include drug proceeds and items of significant value suspected to have been purchased with his drug proceeds."  *Id.* ¶ 4(a)(iii) (emphasis added).  At no point does Special Agent Krueger represent his interpretation of the statements made in the videos as Mr. Briggs' own words.  In fact, the affidavit consistently employs quotation marks every time it quotes Mr. Briggs directly, thereby differentiating between Special

---

[21] Even if the Court were to excise the phrase "as the crew entered the lobby," the affidavit would still indicate that, at the time the witness observed the men in the third-floor common area, the entire area "was overwhelmed by the odor of marijuana."  This is nearly identical to the description provided in the memorandum, which states that "[i]t was reported that there were several men carrying U-Haul boxes with black trash bags in them and that there was a strong odor of marijuana."

[22] The memorandum actually further corroborates the affidavit by reinforcing its conclusion that the five men transported the boxes to Mr. Briggs' apartment.  In the second paragraph of the memorandum, Ms. Burkett states that Mr. Briggs "can be seen using his fob in the elevator and the elevator proceeded to open up on the 27th floor."  Def.'s Mot., Ex. 1. This tends to support the inference that Mr. Briggs, a resident of the building who used his key fob to gain access to the floor on which he lived, took the boxes to his apartment.

[23] Special Agent Krueger has served with ATF since 2013, completed specialized training in Advanced ATF Investigative Techniques and High Intensity Drug Trafficking Area (HIDTA) surveillance, and participated in more than twenty narcotics investigations during his career.  Krueger Aff. ¶¶ 1-2.

Agent Krueger's conclusions and statements made by Mr. Briggs himself. *See, e.g.*, *id.* ¶ 4(a)(iii), 196.

A proper assessment of Special Agent Krueger's interpretations of these videos must consider the context in which these statements were made. Mr. Briggs takes umbrage with Special Agent Krueger's assertion that "people think this shit happen overnight" was a reference to Mr. Briggs' ascension within the Torrence DTO. He claims that these statements made no reference to the drug trade. However, Special Agent Krueger's conclusion is an interpretation of evidence based on his knowledge of the case and as his prior training and experience investigating drug crimes.

During the video, as Mr. Briggs displays various pieces of apparently expensive jewelry in his apartment, he states in relevant part:

> I remember when I was in the fed, when them motherfuckers give me that dime, I used to think about all this shit right here… we used to talk about this shit every motherfucking day…and what make it so crazy, people think this shit happen overnight. They don't know I just did an eight…they don't even know…stood tall…I did everything I was supposed to do.

> Def.'s Mot., Ex. 5 at 0:00:03-00:00:28.

On its face, one could reasonably infer that Mr. Briggs makes reference to his time in prison during the video. While standing next to an individual with whom Mr. Briggs served time in prison, he prefaces his comments with "[w]hen I was in the fed" serving "that dime." As conceded by Defense Counsel during oral argument, this is an apparent reference to his ten year federal prison sentence resulting from his prior drug conviction. *See* Hr'g Tr. 49-51. Next, he states that "I used to think about all this shit right here, we used to talk about this shit every motherfucking day." Given what Mr. Briggs is doing in the video, one could reasonably conclude that this refers to the money and jewelry which investigators suspected were proceeds of his drug dealing. Finally, Mr. Briggs says that he "stood tall…I did everything I was supposed to do." In the estimation of the affiant, the Government, this Court, and presumably the magistrate, Mr. Briggs was referring to the fact that he did not cooperate with investigators during his incarceration. *See, e.g.*, Hr'g Tr. at 107-

108.  Given this context, one could reasonably conclude that "this shit didn't happen overnight" was a reference to his success within the drug trade.  Under the circumstances, it was certainly reasonable for the affiant to conclude that Mr. Briggs was bragging about his lengthy career of drug distribution, emphasizing that the material gains being flaunted in the video were a product of that ongoing career.  Indeed, Mr. Briggs said as much in the social media broadcasts.

Mr. Briggs also asserts that the Instagram videos showing him flashing large amounts of money and what appears to be expensive jewelry portray nothing more than a young man trying to show off.  Def.'s Mot. 14.  According to Mr. Briggs, the Government knowingly or recklessly failed to consider that Mr. Briggs is a male model and party promoter.  *See* Hr'g Tr. at 64-65.  Ironically, while Mr. Briggs accuses the Government of failing to evaluate the totality of the circumstances, this argument attempts to narrow the Court's view of the evidence.  This explanation does not account for the fact that, despite reporting no income to the state for nearly two years, he lived in a $4,540 per month penthouse under an assumed name, drove a BMW, and repeatedly posted videos of himself with large stacks of money and what looks like diamond-laced jewelry.  It likewise does not negate the fact that multiple informants told investigators that Mr. Briggs was a drug dealer, that he was known to associate with members of the Torrence DTO, and that on March 2, 2020, witnesses reported that he and four other men transported large boxes that smelled like marijuana to the floor where he lived.  Taken together, this evidence supports Special Agent Krueger's inference that Mr. Briggs was engaged in drug trafficking and showing off the proceeds on social media.  It was also reasonable for the magistrate to rely on this interpretation in order to understand why the evidence was pertinent to a finding of probable cause.  Conversely, the evidence proffered by Mr. Briggs does not show that Special Agent Krueger had reason to doubt his conclusions nor supports a finding of intentional or reckless misrepresentations of material fact.

40

During oral argument, Defense Counsel repeatedly characterized the investigation and representations in the affidavit as "shoddy" and "sloppy." Hr'g Tr. at 36, 52-53. But shoddy and sloppy is not threshold requirement necessary to trigger a *Franks* hearing. As the Defense conceded, with respect to intentional or reckless misrepresentations, *Franks* essentially demands a showing akin to perjury on the part of the affiant. *Id.* at 41. At a minimum, this requires "an absence of sufficient grounding to support an averment." *See United States v. Brown*, 631 F.3d 638, 648 (3d Cir. 2011). As to omissions, the affiant must have failed to include evidence that "any reasonable person would want to know." *See Yusuf*, 461 F.3d at 383. *Franks* does not require the reviewing court to conceive of better ways to phrase the affidavit. Likewise, affiants need not disclose "every potentially evocative detail" when applying for a warrant. *Russo*, 212 F.3d at 787. Even if the Court accepts that there were other potential innocent explanations for the actions and statements in each video (innocent explanations always tend to exist), this still does not necessarily render the statements in the affidavit false. While Mr. Briggs' arguments may be appropriately suited for casting reasonable doubt at trial, they do not constitute a substantial preliminary showing under *Franks*.

## V.    CONCLUSION

The delay between Mr. Briggs' arrest and indictment did not violate his Sixth Amendment right to a speedy trial or § 3161(b) of the Speedy Trial Act. The continuations issued in this district during the relevant period were a direct result of necessary public safety measures intended to mitigate the spread of COVID-19. Additionally, the issuance and execution of the search warrant on Mr. Briggs' apartment did not violate his Fourth Amendment right against unreasonable searches and seizures. The reviewing magistrate had a substantial basis for finding probable cause to believe that evidence of drug trafficking would be found in the apartment. Underlying the warrant application was an affidavit from investigators that established a sufficient nexus between Mr. Briggs' apartment

41

and his suspected drug trafficking activities.  The representations in the affidavit were based on inferences drawn from investigators' training and experience, as well as their knowledge of the facts of the case.  As such, the Court perceives no basis for concluding that these statements were knowing or reckless misrepresentations or omissions of material fact.  Indeed, the evidence offered by Mr. Briggs corroborated rather than countered the representations of the affiant.

For the aforementioned reasons, the Court concludes that Mr. Briggs' Motion to Dismiss and Motion to Suppress must be denied.  An appropriate order follows.


BY THE COURT:


*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge